FILED

2014 Aug-05  PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|                                                        |     |                              |
| ------------------------------------------------------ | --- | ---------------------------- |
| **ALVIN L. BAILEY,**                                   | }   |                              |
|                                                        | }   |                              |
| **Plaintiff,**                                         | }   |                              |
|                                                        | }   |                              |
| **v.**                                                 | }   | **Case No.: 2:12-CV-594-RDP** |
|                                                        | }   |                              |
| **UNITED MINE WORKERS OF**                             | }   |                              |
| **AMERICA HEALTH AND**                                 | }   |                              |
| **RETIREMENT FUNDS,**                                  | }   |                              |
|                                                        | }   |                              |
| **Defendant.**                                         | }   |                              |

## MEMORANDUM OPINION

Plaintiff Alvin L. Bailey filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., challenging Defendant United Mine Workers of America 1974 Pension Trust Trustees' decision to deny him disability pension benefits. This case is before the court on Defendant's Motion for Summary Judgment. (Doc. # 42). The Motion has been fully briefed. (Docs. # 43, 45 and 49).[1]

---

[1] In addition to opposing Defendant's Motion for Summary Judgment, Plaintiff filed a Rule 56(f) Motion to Continue or to Deny Defendant's Summary Judgment Motion which sought discovery outside of the administrative record in this ERISA case. (Doc. # 46). The court denied that Motion (Doc. # 47), as it had done a similar Motion Plaintiff filed previously. (Doc. # 29). Although Plaintiff continues to argue that he should have been allowed to conduct discovery outside the administrative record, that argument is without merit because Plaintiff "fails to indicate how this information would have aided him in establishing the necessary causal connection between his work-related injuries and his disability." *Wayton v. United Mine Workers of America Health and Retirement Funds,* 2014 WL 2566092 *4 (11th Cir. 2014) (citing *Barfield v. Brierton*, 883 F.2d 923, 931 (11th Cir. 1989)).

## I.     FACTS[2]

Bailey, a former mine worker, was employed by Jim Walter Resources for twenty-four (24) years and is a qualified and vested beneficiary under the Plan for a disability pension. (Doc. # 19 at 9, 16)[3].   The Pension Trust under which Plaintiff seeks disability benefits is a collectively-bargained agreement between the United Mine Workers of America and the Bituminous Coal Operators' Association in accordance with Section 302(c) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 186(c).

The eligibility requirements for a disability pension from the Pension Trust are contained in the Pension Plan, which provides that:

> A participant who has (a) at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident...shall, upon retirement (herein after "Disability Retirement"), be eligible for a pension while so disabled. A participant shall be considered totally disabled only if by reason of such accident such participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

(Doc. # 44-2 at 5).   The Plan requires the following three characteristics to be present for an event to constitute a "mine accident."

(1) <u>Unexpectedness</u>: The disability must have been unlooked for and unforeseen.
(2) <u>Definiteness</u>: The disability must be traceable to definite time, place, and occasion within the course of the mineworker's employment.
(3) <u>Force of impact</u>: The disability must have been caused by the exertion or impact of object against the body or vice versa.

(Doc. # 19 at 338).

---

[2] The facts are taken substantially from Defendant's Memorandum in Support of its Motion for Summary Judgment because Plaintiff Bailey conceded that he had no material disputes with those facts.  (Doc. # 45 at 3).

[3] As a general matter, the page numbers listed refer to the numbering on the Administrative Record.  Pages 1 through 368 of the Administrative record are found in Doc. # 19.  Pages 369 through 809 are found in Doc. # 27.

Bailey was involved in an accident on March 15, 2003 that meets the Plan's requirements for a "mine accident." (Doc. # 19 at 349, 359).

The Social Security Administration ("SSA") awarded Bailey Social Security Disability Insurance benefits ("SSDI") on October 28, 2005 based on: (1) degenerative disc disease ("DDD"), (2) status post diskectomy and re-do laminectomies, (3) obesity, (4) myofascial pain syndrome, (5) post-traumatic stress disorder ("PTSD"), and (6) major depressive disorder ("MDD"). (Doc. # 19 at 2).

On February 26, 2007, Bailey submitted his application for disability pension benefits to the UMWA Health and Retirement Funds. (Doc. # 19 at 9-13).  In response to the application's instructions, Bailey listed two accidents under the "Current Disability" section of his pension application. (Doc. # 19 at 10).  First, Bailey listed the September 23, 2001 mine accident at Jim Walter's No. 5 Mine and identified PTSD as his resulting injury. (Doc. # 19 at 10). Second, Bailey listed a March 15, 2003 mine accident at Jim Walter's No. 4 Mine and identified "back injury" as his resulting injury. (Doc. # 19 at 10).

On September 23, 2001, two separate explosions occurred at Jim Walter's No. 5 Mine, killing thirteen (13) miners. (Doc. # 27 at 465). Thirty-two (32) miners, including Bailey, were underground at the time of the explosions. (Doc. # 27 at 374-75, 389).   The Mine Safety and Health Administration ("MSHA") Report of Investigation concerning the September 23, 2001 mine explosion noted that Bailey was underground in a different section of the mine when the explosion occurred. (Doc. # 27 at 389).  The Report stated that Bailey was sitting on a supply car when he heard what sounded like a big roof fall and mandoors slamming, and stated, "[t]he airflow reversed and then returned to its normal direction. The air was filled with thick dust and while waiting for the dust to clear, they could hear House [the supervisor] paging for Blevins."

3

(Doc. # 27 at 389). They were told to exit the mine immediately, which they did. (Doc. # 27 at 390).  Bailey was included on the list of "Persons Underground at the Time of the Explosion," but was not included on the "List of Injured Miners" included with the Report. (Doc. # 27 at 439-440).

At an initial assessment with Dr. Bentley on October 26, 2001, Bailey's chief complaint was that he had trouble sleeping, anxiety, and flashbacks due to the mine explosion the month prior. (Doc. # 19 at 75). He stated that he went back to work the week before and worked three days. (Doc. # 19 at 75). The physician noted that Bailey should have short term intensive therapy to help reduce post-traumatic stress disorder and prescribed Zoloft and Xanax. (Doc. # 19 at 79). On November 13, 2001, Bailey stated that he was feeling better and was sleeping. (Doc. # 19 at 80). He also noted that he was working, but that it was very rough. He reported that he was still having dreams about the events, hyperventilating, and had a reduced appetite. (Doc. # 19 at 80).

On January 15, 2002, Bailey reported that his mood was better. (Doc. # 19 at 81). He reported that his anxiety had increased since running out of medication, but that his functioning had improved significantly when treated. He noted that he was currently working. He was given a prescription for Zoloft and Xanax. (Doc. # 19 at 81).  On February 19, 2002, Bailey stated that he was functioning okay at work. (Doc. # 19 at 83).  On June 4, 2002, Bailey stated that he was generally able to redirect his mind when he started to worry. (Doc. # 19 at 85). He said he continued to do well, and his mood was good. He stated that his anxiety level was fine, but occasionally he had anxiety exacerbation in the mines. However, he had no panic attacks. His sleep and appetite were fine. (Doc. # 19 at 85).  On September 3, 2002, Bailey reported that his mood was "pretty good," but that "his anxiety [was] still high at times." He also noted that work was going well. (Doc. # 19 at 86).

4

On January 20, 2003, Bailey reported that he was doing well, but he did not have a good Christmas. He stated that he had to look at the report of the mine accident explosion. He reported that he still would have flashbacks if he heard a loud noise while working alone.  However, he did not have much nervousness and his energy was okay. (Doc. # 19 at 87).   On April 22, 2003, Bailey reported that things were going well at work and his sleep and energy levels were good. (Doc. # 19 at 88).

On March 15, 2003, Bailey and another miner, Mickey Pollard, were instructed to move some "rails" (20 ft. I-beams). (Doc. # 27 at 790).  Bailey physically moved the rails near the forks of the "load truck" that Pollard operated. (Doc. # 27 at 790).  When Bailey pulled the last rail, Bailey experienced sharp pain in his lower back and "heard something pop." (Doc. # 27 at 790). When this happened, Mickey Pollard stepped off the load truck and came to check on Bailey. (Doc. # 27 at 790).  Bailey told his immediate supervisor, Ronnie Mayes, that he had hurt his back, in accordance with Jim Walter's injury reporting procedures. (Doc. # 27 at 790).  An "Injury/Illness and Investigation Report" was completed on March 15, 2003, the day of Bailey's injury. (Doc. # 19 at 353). The injury report identified the "Part of the Body" affected as "Alleged Back," and noted both "Upper Back" and "Lower Back." (Doc. # 19 at 353).

Bailey did not seek medical attention until over a month later.  On April 24, 2003, Bailey visited the Emergency Room at Walker Baptist Medical Center. (Doc. # 19 at 29). His chief complaint was pain in his left foot, thigh, and hip. He stated that the pain was persistent since that morning, and that he had pain while weight bearing. (Doc. # 19 at 29).  He reported that the onset of the pain was three days prior. Under past history, depression/anxiety and back strain were noted. (Doc. # 19 at 31, 93).  X-rays were taken of his left femur and left hip. (Doc. # 19 at 36, 89).  He was given a prescription for pain medication and discharged the same day. (Doc. #

19 at 33). He was directed to follow-up with an orthopedic surgeon if he was not better within one week. (Doc. # 19 at 34).

On April 29, 2003, Bailey underwent an MRI of the lumbar spine. (Doc. # 19 at 96-97). The impression was, "(1) Central left paramedian disc extrusion at L3-4 with disc material extending caudally behind the L4 vertebral body. L4 root impingement is likely. (2) Shallower left paramedian disc protrusion at L4-5 with no definite fifth root impingement." (Doc. # 19 at 96-97).

On May 6, 2003, Bailey sought treatment for his left leg pain. (Doc. # 19 at 99). He reported that he fell at home on April 24, 2003. He stated that while he was getting ready for work, his leg gave way. He stated he was unable to work secondary to extreme leg pain. It was noted that an MRI showed HNP at L3/4. Also on May 6, 2003, Bailey underwent a lumbar epidural steroid block by Dr. John Mears. (Doc. # 19 at 100-101; Doc. # 27 at 771-778). Under "History of Present Illness," Dr. Mears noted that Bailey had a history of chronic low back pain with radiation to the left lower extremity. (Doc. # 19 at 100). It was noted that he was recently evaluated by Dr. Cem Cezayirli, and that he had a central left paramedian disk extrusion at L3-4 with probable impingement of the L4 nerve root. Bailey was directed that he could return to normal activities the next day. (Doc. # 19 at 101).

On May 14, 2003, Bailey visited the Neuroscience Lab at Princeton Baptist Medical Center for a sensory nerve conduction study. (Doc. # 19 at 102-106; Doc. # 27 at 770). Dr. William Barr noted, "[t]hese findings are compatible with, but not indicative for, a left L5 radiculopathy, whic[h] has chronic as well as active denervation changes." (Doc. # 19 at 105). Dr. Barr further noted that "there is also mild electrophysiological evidence of tibial neuropathy

at the left foot." (Doc. # 19 at 105). Also on May 14, 2003, Bailey requested a return to work. (Doc. # 19 at 107).

On May 20, 2003, Bailey complained of pain in his back. (Doc. # 19 at 107). On May 21, 2003, he underwent a "hemilaminectomy, L4, left," "removal of free fragment of disk over the vertebral body of L4," "removal of herniated nucleus pulposus, L3-4, left," "exploration of L4-5 disk space, left with extensive foraminotomy," and "microdissection using operating microscope." (Doc. # 19 at 108; Doc. # 27 at 689-766). His preoperative diagnoses were "herniated nucleus pulposus, L3-4 left," "herniated nucleus pulposus, L4-5 left," and "free fragmented disks over the vertebral body of L4 on the left." (Doc. # 19 at 108). Under "History of Present Illness," the surgical report detailed the following:

> This patient fell April 24, 2003, at home when he was getting ready for work, his left leg gave way. He was unable to work secondary to left leg pain…an MRI was done that showed an HNP at L3-4 on the left and he was referred here. The patient was treated conservatively with pain management, epidural blocks. He was seen on May 6, 2003. He was better with conservative care. He underwent epidural block. He wanted to return to work. He was sent back to work. On May 19, 2003, he went to work and he came home and went to bed secondary to pain. He got up and he could not move his right side without severe pain. He had pain in both legs and had pain with any kind of pressure. The patient underwent a myelogram on May 21, 2003 by Dr. Cezayirli that showed a fragment of disk at L4-5 vertebral body on the left with disk at L3-4 on the left and some L5 on the left. Surgical options were discussed with the patient at this time and was ready to proceed with surgery.

(Doc. # 19 at 109).

A myelogram on May 21, 2003, found narrow spinal canal suspected at L3-4 and L4-5 with changes worse at L3-4. (Doc. # 19 at 120). A CT of the lumbar spine found the following: "1. Central and broad-based disc protrusion at L3-L4 level causing encroachment on the lateral recess on the left with some far lateral disc extension, as well on this left side. 2. Mild broad-

based disc bulge at L4-L5. 3. Minimal focal disc bulge/protrusion at L5-S1. No additional findings of significance." (Doc. # 19 at 122).  Bailey's discharge summary noted that a CT had confirmed the myelogram's diagnosis of HNP at L3-4 on the left, upon which Bailey elected to have surgery. He underwent the microlumbar discectomy at L3-4 and L4-5 on May 22, 2003, and was discharged on May 24, 2003. (Doc. # 19 at 115; Doc. # 27 at 714, 724, 766).

On May 22, 2003, a surgical pathology was conducted on Bailey's disc material.  The diagnosis was degenerative fibrocartilage. (Doc. # 19 at 126).

On May 28, 2003, Bailey was doing well and had begun walking. On June 9, 2003, Bailey began physical therapy, and medical staff implemented a plan for him to attend physical therapy two times weekly for three weeks. (Doc. # 19 at 127).  On June 19, 2003, the physical therapist noted that Bailey continued to report improvement. (Doc. # 19 at 128). On June 24, 2003, Bailey stated he was feeling well. (Doc. # 19 at 121).

On June 25, 2003, Bailey returned for an assessment with Dr. Bentley. (Doc. # 19 at 129).  He noted that his mood was stable, and his anxiety was under control. They discussed his recent back surgery. Bailey reported that he was supposed to return to work in two weeks. (Doc. # 19 at 129).

On August 12, 2003, Bailey reported increased pain in his left hip and leg. (Doc. # 19 at 130).  On August 18, 2003, he underwent an MRI of his lumbar spine, and the finding was "postlaminectomy at the L4-L5 level with persistent disc bulging to the left but no evidence for disc fragment. Some postsurgical soft tissue enhancement suggesting early scarring is identified along the left margin of the thecal sac and extending through the laminectomy defect." (Doc. # 19 at 132-133; Doc. # 27 at 679-687).

On September 2, 2003, Bailey reported that he could not put weight on his left leg, but that he was still walking. (Doc. # 19 at 130).  On September 9, 2003, Bailey indicated that the pain came and went, and he had some pain and numbness in his left thigh. (Doc. # 19 at 134). On September 16, 2003, Bailey reported that he was re-living things at times and it would waken him at night. He reported that his mood was up and down. He explained that there had been a lot of talk about the explosion at work recently because people were trying to get a mourning day. He reported pain and stiffness in his back, and that his anxiety level was the same. (Doc. # 19 at 135).

On October 13, 2003, Bailey underwent an evaluation by Dr. Ronald Moon of the Corporate Health System of Alabama. Dr. Moon prepared a report detailing Bailey's treatment up until that point for his left leg pain and numbness. (Doc. # 19 at 136-142).  Dr. Moon's report noted that Bailey presented with symptoms since April 24, 2003, when he woke up to go to work and could not walk. (Doc. # 19 at 136). Regarding Bailey's current symptoms, the report stated:

> Mr. Bailey reports initial onset of symptoms on 4/24/03. He describes his pain symptoms as intermittent localized to the left leg (see pain drawing). He describes this pain as a sharp sensation. He reports his current pain level at 7/10…He admits to numbness, tingling, and weakness of the lower extremities as described (see pain drawing), which is not interfering with functional activities… He admits to depression and anxiety.

(Doc. # 19 at 137).    Under medical history, Dr. Moon noted depression and degenerative disc disease. Regarding pain, he noted that the most significant areas of myofascial pain were in the left hip girdle, left thigh/knee, and left lower leg/ankle regions. (Doc. # 19 at 140).  Dr. Moon's noted his impressions as follows:

> 1. Chronic/recurrent left leg pain, S/P L4-5 laminectomy/ discectomy surgery (unconfirmed level/procedure) 5/21/03. Current symptoms are multifactorial including: soft tissue (musculoskeletal) etiology including somatic (segmental)

dysfunction, myofascial pain, myositis, myotendinosis, ligamentous and muscle imbalance. There is no definite evidence of spinal cord or nerve root compromise. Current complaints appear radicular with L4-5 radiculopathy clinically and weakness left ELH and TA.

2.  Somatic dysfunction of the right OA, cervical C4-5, lumbar left L4-5, sacral base anterior, right anterior innominate rotation.

3.  Myofascial pain and dysfunction (mild) based on location of trigger points, which radiate pain with palpation to well documented reference zones. There is also evidence of myofascial shortening and restriction of full range of motion without pain of involved joints. The following muscles contain the most active trigger points, which with palpation duplicate a significant portion of the patient's pain complaints: Hip Girdle – left gluteus medius/ minimus complex, gluteus maximus, hamstrings/quadriceps. Lower Extremity – left gastric/soleus complex.

4.  Muscle imbalance with shortened /tight lumbar/sacral paraspinals, hamstrings/quadriceps, weak abdominals, and hip extensors with apparent multifidus and transversus dysfunction.

5.  Sleep disturbance – non-restorative sleep pattern.

6.  General deconditioning is major contributing factor.

7.  Obesity

8.  Psychosocial issues affecting physiologic condition.

9.  Degenerative Disc Disease (lumbar/sacral spine)

10. Multiple Medical Issues: Depression, degenerative disc disease

11. Past surgeries include –   Work Related: Denies. Non-work related: Disc surgery: L4 5/22/03 (5/21/03 per Dr. Cezayirli's notes).

(Doc. # 19 at 140-141).

Among other things, Dr. Moon recommended soft tissue manipulation, physical therapy, a home exercise program, education in body mechanics, community fitness program, continue medications, and to consider injections. (Doc. # 19 at 141-142).

On October 20, 2003, Bailey saw Dr. J. Wade who ordered a myelogram and noted that Bailey "did real well for a couple of months and actually went back to work at 6 weeks after surgery, but since that time has developed a lot of left leg pain…" (Doc. # 19 at 173, 197).  On October 21, 2003, Bailey underwent the lumbar myelogram, an MRI of the right knee, and a cervical, thoracic, and lumbar spine MRI. (Doc. # 27 at 615-627). The lumbar myelogram showed "multi-level disk disease." (Doc. # 19 at 144, 150; Doc. # 27 at 630-631). The MRI of the right knee showed, "soft tissue edema greatest at the anterior knee." (Doc. # 19 at 145). The cervical, thoracic, and lumbar spine MRI showed "post-surgical changes at L4-5…The possibility of residual/recurrent disc disease at this level certainly cannot be excluded. There is no visualization of fat surround the exiting left L4 nerve root or descending left L5 nerve root." (Doc. # 19 at 147; Doc. # 27 at 628-629).  On October 22, 2003, Bailey followed up with Dr. Wade after the myelogram, and Dr. Wade noted "the weakness in his nerve indeed may have some permanent type changes around the nerve that we may not be able to make better." (Doc. # 19 at 173, 196).

On October 30, 2003, Bailey was admitted to Brookwood Medical Center for a bilateral re-do laminectomy at L4, a bilateral laminectomy at L5, and an in situ arthrodesis L4-5 using autogenous bone graft. (Doc. # 19 at 155; Doc. # 27 at 635-678).  Dr. Wade performed the surgery and noted that Bailey "continued to have a lot of left leg pain and hip pain that wasn't responding to conservative treatment options.  CT myelogram showed possible recurrence of disc fragment in the L4-5 lateral recess with compression of the L5 nerve root. He had documented L5 radiculopathy as well." (Doc. # 19 at 155).  An x-ray of the lumbar spine that same day indicated L5 radiculopathy. (Doc. # 27 at 657).

On November 7, 2003, Dr. Wade noted that Bailey was doing quite well. (Doc. # 19 at 171-172).   During the latter part of 2013, Bailey had a series of physical therapy visits on November 11, 13, 18, 20, 24, and December 1 and 4. (Doc. # 19 at 128, 158-159).

On December 2, 2003, Bailey saw Dr. Bentley, who noted that Bailey did not like being confined due to his physical condition and still had occasional flashbacks. (Doc. # 19 at 160).

On January 6, 2004, Dr. Wade told Bailey he could have one more prescription for Lortab, but if he continued having chronic pain, Dr. Wade planned to send him to pain management. (Doc. # 19 at 171, 196).   On March 2, 2004, Dr. Wade noted that Bailey's leg was better, but that he was getting back pain on rainy days. Dr. Wade noted that he believed this was arthritic. (Doc. # 19 at 171, 196).

On March 5, 2004, Dr. Bentley noted that Bailey had not returned to work since October, his back was improving, and that he still had anxiety and flashbacks. (Doc. # 19 at 164).   On April 21, 2004, Bailey reported that he was not having as many flashbacks. (Doc. # 19 at 167). On April 27, 2004, Bailey indicated that he would like to try to go back to some form of light duty. Dr. Wade noted he did not want him to pick up anything over 50 pounds and expressed doubt regarding whether Bailey would be able to go back to his regular job. (Doc. # 19 at 171, 195).

On May 5, 2004, Bailey reported that his mood had been up until recently when he learned of the death of friend. He indicated another flashback, but was sleeping better and longer. (Doc. # 19 at 170).

On May 19, 2004, Bailey reported that his mood was better. The note further stated, "[h]e had a second back surgery that has helped somewhat. He has not been released to go back to

work and is unsure if he will be able to go back [because] of the stipulations they have on him."
(Doc. # 19 at 172). He reported that he had no flashbacks. (Doc. # 19 at 172).

On June 16, 2004, Bailey noted that his energy level was low, his back still bothered him,
and he was still off of work. (Doc. # 19 at 176). He reported that he was upset because he heard
of a mine worker being killed in the mines, although he was unsure if he knew the person. (Doc.
# 19 at 176).

On June 17, 2004, a Residual Physical Functional Capacity Assessment for the SSA was
completed by a disability specialist and a medical consultant. (Doc. # 19 at 177-184). The
primary diagnosis was "lumbar DDD[4]," and the secondary diagnosis was "obesity – BMI = 42."
(Doc. # 19 at 177).   The notes in the Assessment explained:

> Clmt is a 44 yr old male with back and leg pain. Clmt suffers from
> DDD lumbar spine L2-L3 level, Ct lumbar spine xray with contrast
> noted mild disc bulge as L4-L5 minimal focal disc
> bulge/protrusion out L5-S1. 5-21-03 other pain due to left
> leg…Clmt is partially credible as to [postural] limitations due to
> back and knee pain…Dr. Wade opined [claimant] would have
> some limitation of ADL and that opinion given great weight in this
> RFC.

Doc. # 19 at 179.

On July 9, 2004, Bailey underwent a Comprehensive Psychological Evaluation by Dr.
Samuel Popkins. (Doc. # 19 at 185-189). Dr. Popkins stated:

> The claimant appears to have moderate PTSD syndrome related to
> an on-the-job trauma (in which he was fortunately not hurt very
> badly physically), as well as bona fide pain disorder related to
> chronic back impairment and partly failed surgical interventions
> for same. The severity of psychopathology observed is high-
> moderate. Prognosis appears both chronic and guarded, and I
> imagine that his PTSD symptoms are made more chronic by his
> difficulty in recovering his physical functioning in his back. The
> claimant is getting regular psychiatric care and might do well to

---

[4] This is a common abbreviation for degenerative disc disease.

> become more involved in focused treatments for both PTSD and
> pain management.

(Doc. # 19 at 188).

On July 19, 2004, Dr. Bentley noted that Bailey's mood was not good because his seventeen year old son had died of a myocardial infarction (a heart attack). Bailey reported that he also had a daughter that died from heart disease at age thirteen. (Doc. # 19 at 190).   On August 16, 2004, Bailey reported that he was having problems dealing with his son's death. His energy level was low and he had poor appetite. (Doc. # 19 at 191).

In an SSA Psychiatric Review Technique dated August 13, 2004, the disability specialist found that a RFC (residual functional capacity) assessment was necessary, based on Bailey's affective disorders and anxiety-related disorders. (Doc. # 19 at 54).   Bailey was found to have moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. He was found to have mild restrictions on activities of daily living due to his affective and anxiety-related disorders. (Doc. # 19 at 64).   Depression was noted as well as "DDD." (Doc. # 19 at 66). The consultant noted that, "[Claimant] alleged PTSD and QCE [qualified medical examiner] found evidence of PTSD 2° to mine explosion and pain DO [disorder]. PTSD was seen as moderate. CE's [consultive examiner] MSO2 is given some weight but the MSE [mental status examination] and ADLs [activities of daily living] do not indicate marked difficulties w/ coping particularly in another industry other than mining. ADLs were seen as partially credible as CE did not substantiate allegations…" (Doc. # 19 at 67).

A disability specialist completed a Mental RFC Assessment on Bailey on August 13, 2004, and stated:

> He could follow simple and detailed familiar instructions. He could
> sustain attention to routine tasks for extended periods. He would
> not tolerate working in a mine environment again due to

> heightened PTSD issues. He could tolerate ordinary work pressures in a well regulated work setting without excessive workloads or rapid changes. Contact with the public should be [illegible]. Feedback should be supportive. He could adapt to gradual changes.

(Doc. # 19 at 71).

On August 25, 2004, Bailey returned to Dr. Wade for a follow-up appointment for his lower back. (Doc. # 19 at 195). Dr. Wade noted, "[h]e says he wants to go back to work if at all possible. I have reiterated to him that I am not comfortable releasing him to full duty but would be glad to review some job descriptions that they may have for him." (Doc. # 19 at 195).

On August 30, 2004, Dr. William Crunk sent a letter to Bailey's counsel stating that he had evaluated Bailey to determine his vocational employability on June 3, 2004. (Doc. # 27 at 605). Dr. Crunk stated that Bailey was working in the mine during the mine explosion on September 23, 2001. He stated that the explosion knocked Bailey from the machine he was operating to the floor and that he suffered bruises to his arms and shoulders and minor cuts. Dr. Crunk further noted that Bailey's flashbacks and nightmares had diminished until a friend had died recently. (Doc. # 27 at 606).

On November 4, 2004, Bailey reported to Dr. Bentley that he "had mediation on 11-13[th] last month regarding the injuries sustained from the mine accident. Pt reports that he had a rough time. He is going to Court getting depositions about the mine accident." (Doc. # 19 at 198). Bailey also reported that he did not have too much pain, and he thought he might be released back to work. (Doc. # 19 at 198).

Jim Walter Resources, Inc.'s documents indicate that Bailey's last day to work was January 27, 2005. (Doc. # 19 at 15). On January 28, 2005, Bailey reported to Dr. Bentley that he had gone back to work, but was being pressured to do work that required help. (Doc. # 19 at

199). Bailey also reported that he was having anxiety and flashbacks. He told Dr. Bentley that he did not feel that he would be able to continue working due to his nerves and leg. (Doc. # 19 at 199).

On February 7, 2005, Bailey reported to Dr. Bentley that he had a lot of back pain, and that his back doctor told him he could not work in the mines. He also reported still feeling anxious and jumping when hearing something loud. (Doc. # 19 at 200).  On February 28, 2005, Bailey reported that he was depressed and noted that his mother had died the previous week, and he still had a lot of back pain. (Doc. # 19 at 201).

On March 15, 2005, Bailey filed a Complaint seeking Worker's Compensation benefits against his employer, Jim Walter Resources. (Doc. # 19 at 47-49).   In the Complaint, Bailey argued that he injured his back moving rails while working and within the scope of his employment.   Jim Walter Resources filed an Answer, denying the material allegations in the Complaint. (Doc. # 19 at 601-602).

On March 15, 2005, Bailey reported that his mood was better and that his anxiety was under control. However, he was still having a lot of back pain. (Doc. # 19 at 202).  On March 29, 2005, Bailey reported that his mood was improving and that he felt better, but he was still unable to work in the mines. He was not having as many flashbacks, but was easily agitated. (Doc. # 19 at 203). On April 26, 2005, Bailey reported that he believed a change in medication had helped his mood. (Doc. # 19 at 204).   On May 27, 2005, Bailey reported that his mood was slightly improved, and that his pain was "not bad" as long as he did not lift. He reported that he fished and walked to church. (Doc. # 19 at 205).

On July 18, 2005, Bailey reported that he had a lot of pain associated with a recent storm system. He also reported that he had recently been a pallbearer at a friend's funeral.  (Doc. # 19

at 206).  The friend was a mine worker who had suffered a heart attack.  (*Id*.).  Bailey indicated

that he still felt anxious much of the time.  (*Id*.).

On December 7, 2005, Bailey sat for deposition in his Worker's Compensation case.

(Doc. # 27 at 783-809).  Bailey testified in his deposition concerning the March 15, 2003 mine

accident as follows:

> It was getting toward the end of the shift and Ronnie Mayes told us
> we couldn't leave out unless we moved the rails. So Mickey
> Pollard was on the low track. So I bent down to pick the rail up and
> I heard something pop. So Mickey got off and he came there, we
> moved the rails, and then I went and told Ronnie Mayes that I had
> hurt my back. And that's what you're supposed to do is report it to
> your immediate supervisor and I did that…

(Doc. # 27 at 790.  Bailey further testified that he went to work the following day and continued

to work full-time until he "got up one morning going to work and [his] leg went out." He noted

that he sought medical treatment that same day. (Doc. # 27 at 792-793).

In his deposition, Bailey was asked, "[a]t or about the time you went to the emergency

room, did you ever contact anybody there and say that you couldn't come because of an injury

you had suffered at work…?" Bailey responded "No, sir."   (Doc. # 27 at 794).  When asked why

he quit working, Bailey testified "[m]y back, and I was going to see Dr. Bentley." (Doc. # 27 at

799).

On November 1, 2006, Bailey settled his Worker's Compensation claim. (Doc. # 19 at

44-46).  Bailey accepted a $5,000 payment in full settlement of this claims, and his attorney

received $3,000. The agreement provides, in part:

> The parties have consented to the jurisdiction of this Court and
> have stipulated that there are numerous, significant, legitimate
> issues regarding the plaintiff's claim in this matter, which involves
> back and leg injury/condition. The employer denies that the said
> conditions arose from the plaintiff's employment with it denies
> that it received notices of the alleged accident/injury as required by

> the Alabama Worker's Compensation Act, and therefore, the employer denies that the plaintiff's claims in this case are compensable under the Act. The defendant further denies that it is obligated to pay to the plaintiff any worker's compensation benefits pertaining to said injury/condition…The parties have informed the Court that the proposed lump sum compromise settlement payment is intended to conclude this matter in its entirely, and encompasses all worker's compensation claims benefits of any nature, including, but not limited to, … medicals, past, present or future.

Doc. # 19 at 44-45.

On October 10, 2005, Dr. Crunk sent a letter to Bailey's counsel which stated:

> As you know I evaluated Mr. Bailey for his work related injury on June 4, 2004. I have since reviewed additional record of Dr. Terry Bentley, particularly a record of March 10, 2005 which indicates the severity of his mental impairment. Based on these finding regarding the severity of his PTSD and Major Depression, *Mr. Bailey would have a 100% loss of employability and would not be able to work in any occupation. This condition has been present since September 23, 2001.*

Doc. # 19 at 208 (emphasis added).

The SSA Disability Determination Form dated November 21, 2005, states that Bailey was disabled effective April 24, 2003. The primary diagnosis was "disorders of the back (discogenic and degenerative)."  The secondary diagnosis was "affective; or mood disorders." The form referenced the decision by the Administrative Law Judge dated October 28, 2005. (Doc. # 19 at 1).  In the ALJ's decision, he stated, "I find you disabled as of April 24, 2003 due to degenerative disc disease, status post diskectomy and re-do laminectomies, obesity, myofascial pain syndromes, post-traumatic stress disorder and MDD[5] so severe that you are unable to perform any work existing in significant numbers in the national economy." (Doc. # 19 at 2).

---

[5] This is a common abbreviation for Major Depressive Disorder.

On February 28, 2007, Bailey submitted an application for disability pension benefits. (Doc. # 19 at 8-13).  In his application, Bailey stated that his last day worked in the coal industry was January 27, 2005. He claimed that two mine accidents contributed to his disability. He claimed he suffered from posttraumatic stress due to the September 23, 2001 mine explosion, and a back injury from a March 15, 2003 accident while moving rails. (Doc. # 19 at 10).  Bailey submitted a copy of emergency room record from April 2003, which he stated were "approximately 2-3 weeks after the injury." He claimed that he did not realize at that time that his problems were related to his injury from work. (Doc. # 19 at 26).

Initially, at a September 25, 2008 pre-hearing conference, Bailey was informed that he had not submitted proof of a mine accident. His attorney informed the pre-hearing counselor that they would send proof of the litigation with his employer, as well as eye witness testimony concerning the mine accident. (Doc. # 19 at 332).  However, Jim Walter Resources discovered it had an incident report that noted that Bailey had reported an alleged back injury on March 15, 2003. (Doc. # 19 at 353).  Bailey also supplemented the information in support of his application for disability pension benefits with a transcript of an interview with a co-worker. (Doc. # 19 at 50-53).  The co-worker described the 2003 accident in the interview as follows:

> The best I can tell you as to what we were doing, we were building a wall together and we finished the block, but were low of some supplies of rock, and we went out on the track and there were some I-beams – I'm pretty sure that is how it happened – the I-beams were out there in the way of the low tracks of the forklift that moves the blocks, and then Alvin was attempting to move the I-beams and he kind of grunted – I could tell that something snapped or something hurt him in some way…we continued working but then he said something to Ronnie Mays about he was afraid he might have hurt himself. It didn't put him on the ground but he wanted him to know that he thought he might have hurt himself.

Doc. # 19 at 51-52.

On January 7, 2009, the Plan's hearing officer noted that the requirements of a mine accident had been met, and that Bailey's file was being reviewed to determine whether there was a causal link between the mine accident and the impairments that were the basis for Bailey's SSDI award. (Doc. # 19 at 338-339).   On January 27, 2009, Dr. Bentley wrote a letter stating that, following the mine explosion in 2001, Bailey began having elevated anxiety, social withdrawal, and fear of going to sleep. Dr. Bentley further noted that Bailey had never had complete alleviation of his PTSD, and he had also had symptoms of depression. He noted that he had shown improvement, but was socially uncomfortable. (Doc. # 19 at 41). Dr. Bentley stated that it was his professional opinion that Bailey was unable to work due to the physical and psychological damages he sustained resulting from underground mining injuries. (Doc. # 19 at 42).

On March 19, 2009, Bailey's disability pension application was denied. (Doc. # 19 at 344-352). The denial explained that, although Bailey was involved in a mine accident on March 15, 2003, the evidence did not connect his lower back problems and back surgeries to that accident. (Doc. # 19 at 345-350). Bailey appealed his denial of disability pension benefits.  In support of his appeal, he presented the MSHA report on the 2001 mine explosion and the Worker's Compensation Settlement Order. (Doc. # 19 at 209).

On June 22, 2009, Bailey's appeal was denied. (Doc. # 19 at 358-368). The decision noted that Bailey was able to return to work after the 2001 mine explosion without significant loss of time. (Doc. # 19 at 366). It also concluded that medical evidence did not establish a causal link between Bailey's back disorders and the 2003 mine accident. (Doc. # 19 at 367).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, Rule 56 has limited application here because the district court in an ERISA case "sits more as an appellate tribunal than as a trial court" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002). To that end, the court is guided by the Eleventh Circuit's six-step sequential framework for reviewing ERISA benefit denials which consists of the following steps:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision was "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is " de novo wrong " and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Wayton v. United Mine Workers of America Health and Retirement Funds*, 2014 WL 2566092 *3 11th Cir. 2014); *Blankenship v. Metro. Life. Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). This court's review of the Trustees' decision is limited to "consideration of the material available to the administrator at the time it made its decision." *Blankenship*, 644 F.3d at 1354 (citing *Jett v.*

*Blue Cross & Blue Shield*, 890 F.2d 1137, 1140 (11th Cir.1989)). Furthermore, the claimant has the burden of proving entitlement to ERISA benefits. *Glazer v. Reliance Std. Life Ins. Co*., 524 F.3d 1241, 1248 (11th Cir. 2008).

The parties agree that the proper standard-of-review in this case is the "abuse of discretion" standard.  (Doc. # 15 at 4).  Courts have looked at the specific language in the "1974 UMWA Pension Plan and found that the UMWA Pension Plan explicitly grants the Trustees broad discretionary authority." *Boyd v. Trustees of United Mine Workers Heath & Retirement Funds*., 873 F.2d 57, 59 (4th Cir. 1989).  (Doc. # 15 at 5).

## III.    ANALYSIS

The Trustees do not dispute that Bailey was involved in a mine accident on September 21, 2001, and a second mine accident on March 15, 2003. (Doc. # 43, pp. 24-26). Nor do the Trustees dispute that Bailey was awarded a Title II SSDI benefits based on: (1) degenerative disc disease ("DDD"), (2) status post diskectomy and re-do laminectomies, (3) obesity, (4) myofascial pain syndrome, (5) post-traumatic stress disorder ("PTSD"), (6) major depressive disorder ("MDD"). (Doc. # 19 at 2).  The Trustees dispute, however, that there is a causal link between the mine accidents and the disabling conditions.  (Doc. # 43 at 26).

The eligibility requirements for a disability pension under the Plan provide: (1) there must be verifiable evidence that the applicant was involved in a mine accident; (2) the applicant must be awarded a Title II SSDI Award as evidence of a total disability; and (3) there must be a causal link between the mine accident and the claimed disability. (Doc. # 44-2 at 5).

### A.    The Trustees Decision Denying Benefits Was Correct

Bailey alleges that he suffered disabling PTSD from the September 21, 2001 mine accident.  Although Dr. Crunk, in a letter dated October 10, 2005, opined that Bailey had a 100%

loss of employability since the September 21, 2001 mine accident, Bailey in fact worked successfully for approximately a year and a half after that accident. While he was out of work seeking treatment for his back, Bailey expressed a desire to return to work. Moreover, the PTSD was listed fifth out of six conditions contributing to Bailey's disability according to the SSA. Thus, the Trustees were correct in determining that PTSD contributed only minimally to Bailey's disability.

As to Bailey's depression, there is simply no medical evidence that it was related to a mine accident. In addition, the records reflect other potential causal factors which could account for a major depressive disorder diagnosis, including that, during the relevant time period, Bailey's son died, he had lost a daughter previously, and he experienced a number of other deaths among his friends and family. Therefore, the Trustees were correct in determining that the evidence did not support a conclusion that this condition was causally related to a mine accident.

The Trustees were also correct in determining that obesity is simply not a condition that is caused by a mine accident.

Bailey also argues that his disabling back conditions were the result of the March 15, 2003 mine accident where he felt something pop in his back while lifting rails. However, there is little, if any, medical evidence attributing his back conditions to that accident. Bailey did not seek medical treatment at or around the time of that accident and lost no work time following that accident. He continued to work successfully for over a month before he even sought medical treatment. Added to these facts, when Bailey sought medical treatment in April 2003, Bailey himself reported the cause for seeking treatment as leg pain after a fall at home. At that time, he denied any recent injuries. Moreover, his disc disease was diagnosed as being

degenerative, rather than being caused by an accident.  The discectomy and re-do laminectomy were surgeries Bailey chose to have, and the medical records to not show that the need for the surgeries was related to a mine accident.  Rather, the series of events that culminated in the surgeries stemmed from, according to Bailey himself, a fall at home.  Therefore, the Trustees were correct in determining that these conditions were not causally related to a mine accident.[6]

Again, as to Bailey's myofascial pain syndrome, the areas where Bailey experienced this pain were in the left hip girdle, left thigh/knee, and left lower leg/ankle regions. Doc. # 19 at 140. Bailey received this diagnosis from Dr. Moon, from whom he sought treatment after the fall at home.  Bailey reported the onset date of this issue to be April 24, 2003, the date he fell while at home.  There was also evidence that Bailey's pain fluctuated with the weather and at least one treating physician believed it to be arthritic in nature.  Based on this medical evidence, and the dearth of medical evidence attributing the cause of the pain to a mine accident, the Trustees were correct in determining that Bailey had not shown that these conditions were causally related to a mine accident.

Finally, Bailey's disability onset date was April 24, 2003, the date of his fall at home. This date falls over a month after Bailey's reported mine accident, during which time he neither sought medical treatment, nor lost work time.  Therefore, this fact, too, supports the Trustees' decision that Bailey was not disabled due to a mine accident.

### B.      There are Reasonable Grounds for The Trustees' Decision

Under the multi-step ERISA framework, the court's inquiry ends after the court determines that the Trustees' decision was correct.  *Blankenship*, 644 F.3d at 1355.  However,

---

[6] The court also notes that the record contains a glaring inconsistency between Bailey's claim on the one hand, before this court, that the 2003 mine accident resulted in disabling medical conditions and the fact that, on the other hand, he settled his worker's compensation claim regarding the same accident for $5,000.00 (exclusive of attorney's fees) – a settlement which purported to encompass all "medicals, past, present and future."  (Doc. # 19-1 at 44-45).

alternatively and additionally, the court concludes, consistent with the discussion above, that even if the Trustees' decision was wrong (and, to be clear, the court finds that it was not), there were "reasonable" grounds in the record which support their decision. Because reasonable grounds exist to support the Trustees' decision, it is unnecessary for the court to determine if the Trustees operated under a conflict of interest. Even more importantly, at no point has Bailey argued that such a conflict exists. And in their Joint Report In Initial Benefits Case (Doc. # 15 at 6), the parties agreed that no structural conflict of interest exists in this case. Therefore, this court's consideration of Plaintiff's ERISA claim is at its end.[7]

## IV.   CONCLUSION

The Trustees' decision is due to be affirmed. A separate order will be entered.

**DONE** and **ORDERED** this August 5, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[7] In his Response in Opposition to Defendant's Motion for Summary Judgment, Bailey argues that Defendant breached its fiduciary duty in administering the Plan. (Doc. # 45 at 22-29). However, Plaintiff's Amended Complaint contains no breach of fiduciary duty claim. (Doc. # 6). Therefore, this issue is not properly before the court. A plaintiff may not amend his complaint through argument in a brief opposing summary judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004). Moreover, any such claim would fail because, as discussed above, the record supports the Trustees' decision.